**ESCOA FINTUBE CORPORATION, an Oklahoma Corporation, Plaintiff–Appellant,**

v.

**TRANTER, INC., a Michigan Corporation, Defendant–Appellee.**

No. 79–1518.

United States Court of Appeals, Tenth Circuit.

Argued July 7, 1980.

Decided Sept. 18, 1980.

Harold L. Jackson of Jackson, Jones & Price, Law Corp., Tustin, Cal. (Albin H. Gess of Jackson, Jones & Price, Law Corp., Tustin, Cal., and Thomas R. Brett of Jones, Givens, Brett, Gotcher, Doyle & Bogan, Inc., Tulsa, Okl., with him on the brief), for plaintiff–appellant.

William S. Dorman, Tulsa, Okl. (William C. Anderson of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., with him on the brief), for defendant–appellee.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Northern District of Oklahoma. The action in that court sought enforcement of two patents, the Boose '228 and the Boose '774. The claim was that Tranter, Inc. had infringed. The judgment was that patent '228 was invalid and unenforceable under 35 U.S.C. § 102(a) and (b). The ruling was that it had been anticipated by the prior art. Also, the trial court held

Boose '774 to be invalid within the terms of 35 U.S.C. § 103 in that it was obvious in view of the prior art.

The two patents in suit are numbered 3,752,228 and 3,764,774. These have been referred to in the briefs and are referred to here as '228 and '774. Both were issued to Robert C. Boose and now are owned by the plaintiff Escoa Fintube Corporation (Escoa).

The trial court denied relief on the grounds noted above, and we must determine whether the court erred in its findings, conclusions and judgment.

In addition to the general contentions which are that the court erred in holding the Boose '228 patent invalid under 35 U.S.C. § 102(a) and (b) as being anticipated by the prior art, and that the court erred in concluding that the Boose '774 patent was invalid as being obvious in view of the prior art, there are additional challenges, which are that the district court erred:

In concluding that claims 1, 2, 5, 6 and 7 of the Boose '774 patent are invalid under 35 U.S.C. § 112.

In its application of *Graham v. John Deere*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

In holding that the presumption of validity attaching to patents '228 and '774 had been weakened due to a Japanese pamphlet published by the Dengensha Company of Hiroshima, Japan, and also had been weakened by the construction of the Thermatool welding machine. The court thought it significant that neither of these had been called to the attention of the examiner. Plaintiff–appellant argues that neither reference was pertinent as a prior art patent.

In concluding that the Japanese language pamphlet referred to above was a printed publication that constituted a full disclosure of the Boose '228 patent.

In not considering the commercial success, long felt need and failure of the experts in considering obviousness.

In characterizing the invention of the '774 and '228 patents as an aggregation of elements old in the art which performed no new or different function.

In comparing the inventions of the Boose '228 and '774 patents with the prior art on an element by element basis rather than viewing the inventions as a whole.

In the inferences it drew from certain foreign and U. S. prior art, some of the foreign documents being introduced into evidence without the benefit of English translation.

## STATEMENT OF THE FACTS

Suit was filed by Escoa in 1976 pursuant to 35 U.S.C. § 271 seeking recovery for willful infringement of Boose '228 and '774 patents against Tranter, Inc.

Escoa was shown to have been engaged in the manufacturing and sale of heat exchange tubes. Tranter, although a Michigan corporation, has had a place of business in Tulsa, Oklahoma, known as its Kentube Division. The Tulsa location serves as the site of manufacture of serrated fin heat exchange tubes, the embattled product and the subject of the infringement action.

Boose '228 patent was issued August 14, 1973, and Boose '774 was issued October 9, 1973. Tranter had begun the manufacture of serrated finned tubing in September 1973. The charge is that Tranter, or Kentube, infringed claims 1 and 2 of the Boose '228 patent and claims 1, 2, 5, 6 and 7 of the Boose '774 patent. Infringement is denied on the basis of invalidity of the patents and, of course, it is denied that there is any infringement.

The trial court concluded that both patents were invalid, and on the basis of its holding concluded that the patents were not infringed.

The product here is a species of finned tubing which operates in heat exchangers. These finned tubes transfer the heat from hot gases circulated over the exterior of the tube to cooler fluids circulated in the interior of the tubes. The amount of heat transferred is important and it is affected by the large surface area of the tube. The heat

transfer is greater in relationship to the large surface area. The increase of surface area, so it is said, has been increased by various factors such as studs, rings and fins which are secured to the surface of the tubes by brazing, soldering, low frequency resistance welding, fillet welding, high frequency resistance welding, etc. Each type of extended heat transfer surface is said to have certain advantages over other types. For high temperature applications, fins which are secured to the tubes by high frequency resistance welding, have been preferred.

The fins are formed from flat strips of metal which are secured to the tube on an edge so as to form an I–type fin, or the fins may be bent in the form of a U, V or L to provide U–shaped, V–shaped and L–shaped fins, respectively. The fins are fastened to a tube longitudinally, or helically wrapped around it. The fins may be plain and also solid, notched, serrated or perforated.

The serrated I–type fins spirally wound around the heat transfer tube are said to be advantageous as compared with plain or perforated fins. Appellant claims that prior to their discoveries, although there was a need for helically wound I–type serrated tubing, experts doubted whether the high frequency welding process could be used to weld such a fin around a tube. Appellant says that Mr. Boose, by using the Thermatool machine and experimenting, succeeded in accomplishing it.

Finned tubes have a variety of applications in the process of heat exchange,[1] and are used, for example, in turbines, boilers, economizers, coolers and generators. Metal fins are attached to the exterior of tubing in order to increase the effective surface area for heat transfer between a cooler fluid flowing through the interior of the tubing and a hotter gas or liquid circulating over the exterior of the tube. Finned tubes consist of a solid metal tube with attached

metal fins extending radially outward from the surface of the tube. Finned tubes are manufactured in a variety of configurations according to their ultimate use: the larger the surface area of the tube, the greater the heat transfer efficiency. Each type has advantages and disadvantages. The relative advantages and disadvantages of the different welding methods, and the various configurations of finned tubing according to their applications are discussed at length in the trial court's opinion, pp. 4–7. *See* Findings Nos. 8, 9 and 10. The fins are secured to the outside of the tube by various types of welding techniques such as brazing, soldering, low frequency resistance welding, fillet welding or high frequency resistance welding. The fins may be fastened to the tube longitudinally or wound around it helically. The fins themselves take different forms, typically either solid, or segmented. Solid fins consist of a solid metal strip, while segmented fins consist of a metal strip with vertical segments formed by punching slots (notched fins) or cutting slits or serrations (serrated fins) at intervals along the length of the metal strip. The root or base of the fin which is welded to the tube also may take various forms. For L–type, U–type and V–type fins, a flange is bent out from the base of the fin and in either an L– U– or V–shape, and this flange is welded to the tube. For I–type fins, there is no flange; the lower edge of the metal strip is welded directly onto the tube. *See* Findings Nos. 18, 19 and 20.

Among the various welding methods, low frequency resistance welding has been used since the late 1940's for welding footed fins such as the L–type, U–shape and V–shape. Resistance welding involves application of an electric current to the tube and fin. The weld is formed by molten metal at the point of contact between the fin and the tube. A pressure wheel is used to bend the fin and simultaneously to forge the fin to the tube.[2]

---

1. *See* the trial court's finding No. 7.

2. The court in Finding No. 12 said:

   12. Other methods are low or standard frequency resistance welding and high fre-

quency resistance welding. These methods involve the application of electrical current to the tube and the fin. When the fin touches the tube there is a melting at the point of contact which forms the weld. A pressure

Until the early 50's, it was not possible to manufacture I–type finned tubing by resistance welding. In the early 1950's, however, Wallace Rudd, founder of the predecessor of AMF Thermatool Corp., developed an apparatus for high frequency resistance welding of finned tubing, and adapted the process for manufacture of helically wound I–type solid finned tubing. This apparatus, the "Thermatool machine," as well as several high frequency welding processes, are covered by patents owned by AMF Thermatool, including U. S. Letters Patent No. 2,821,619 (Rudd '619), 3,047,712 (Morris '712) and 3,362,058 (Morris '058). Thermatool has sold its machine to patent licensees, including both Escoa Fintube and Tranter.

Escoa purchased a Thermatool machine and entered into a license agreement with Thermatool in 1968. According to the testimony of Harold W. Jarvis, the president of Escoa, the license agreement was drafted broadly to include the manufacture of both solid and serrated fin tubes in order to cover everything that could possibly be made on the machine.[3] The pertinent language of the license agreement is as follows:

> Welding of Spiral and Longitudinal Finned Tube. This license includes the welding of one or more strips or pieces of metal onto the surface (exterior or interior) of a pipe, tube or solid bar stock such as the manufacture of solid and serrated finned tube or pipe by welding a metal strip or metal segments (connected or not by a base strip) in a spiral or longitudinal path on the surface of the tube or pipe
> . . .

Tranter first became aware that Escoa was producing an I–type serrated fin tube in 1969, when one of their salesmen brought back a sample from a trade show. Tranter first began making I–type serrated finned

tubing in 1973 in response to a request by Westinghouse. Tranter achieved a satisfactory weld the first time they tried to produce such tubing on the Thermatool machine.[4]

## SUMMARY DESCRIPTION OF THE PATENTS

*The Boose '228 Patent–The Article Patent*

The Boose '228 patent, the article patent, discloses a segmented finned tube comprised of helically wound, I–type serrated fin stock continuously welded on its edge to a tube by the high frequency resistance welding method. The claims are as follows:

1. A finned tube for utilization in a heat exchange apparatus comprising:

an elongated cylindrical tube; and a segmented fin stock helically wound on an inner edge thereof on the cylindrical surface of said tube, and an uninterrupted weld joint extending uninterruptedly across the inner edge of the fin stock and tube and terminating at the side surfaces of the fin stock and tube, said fin stock comprising an elongated strip of metal having a major portion thereof forming radially extending segments, the weld joint formed of and consisting only of said fin stock and tube material being substantially continuous, said fin stock further comprising a lower side portion defining a flat, uninterrupted lateral surface extending from said radially extending segment portion and terminating at said tube surface, the lower side portion and at least a central portion of each segment defining a plane substantially at right angles to the surface of the tube.

2. The invention of claim 1 wherein said segmented fins are twisted at an angle with respect to the plane of the fin stock.

---

wheel is employed with these two methods, to aid in the bending of the fin, and as a simultaneous operation, to forge the fin to the tube. Like the TIG method the weld is made up of only the fin and tube materials.

3. *See* Finding No. 13.

4. As noted above, Escoa was at the time in question and long prior thereto fully cognizant of the Thermatool machine since it had entered into a license agreement with Thermatool. This license agreement included the manufacture of both solid and serrated fin tubes in order to cover everything that could be made on the machine.

3. The invention of claim 2 wherein said flat uninterrupted lateral surface is at least 0.375 of an inch in radial height.

4. The invention of claim 1 wherein said segments are positioned substantially parallel to the lower side portion.

\*　　\*　　\*　　\*　　\*　　\*

*The Boose '774 Patent—The Method Patent*

The Boose '774 patent, the method patent, discloses a method for continuously welding helically wound, I–type segmented fin stock to a cylindrical tube by the high frequency resistance method. In order to achieve a continuous weld between the fin stock and the tube, the fin stock is serrated, with the major portion of the stock forming segments and the remaining unserrated part forming the root portion. The stock is helically wound around the tube with the edge of the root portion contacting the tube. Electrical contacts are positioned on the side of the fin stock and on the tube just prior to the point where the fin will contact the tube, and a high frequency current is applied to the contacts. The current passes between the two contacts, when the root portion of the fin and the tube come in contact. The tube and fin melt at the point of contact, and forging force is applied to create the bond. The claims of the Boose '774 patent are as follows:

1. A method of bonding a heat transfer I type flat fin stock to a cylindrical surface of a tube to form a heat exchanger for turbines, boilers and the like comprising the steps of:

cutting said I–type fin stock to form a plurality of radially extending major fin portions and a root portion;

providing a contact area on a side of said flat fin stock;

helically bending said segmented fin stock so that an edge adjacent the root portion is positioned onto said cylindrical surface and the major fin portion forms a serrated shape;

electrically contacting said side contact area with a first electrode for engaging said side contact area at a position just prior to the mutual engagement point of said I shaped fin stock and said tube;

electrically contacting said tube with a second electrode for engaging the registering surface of said tube just prior to said mutual engagement point;

applying an ultra–high frequency current to said electrode, a current path being provided between said electrodes via said side contact area and said tube surface thereby causing said root portion and said tube surface to melt; and

applying a forging force to said fin stock through the serrated fin portions to assist in creating a continuous fused permanent bond between said root portion and said tube surface.

2. The method of claim 1 further comprising the step of laterally supporting said fin stock as said forging force is applied to the tips of said fin stock.

3. The method of claim 2 further comprising the step of bending said fin portions out of the plane of said root portion after cutting and contacting said contact area in the plane of said root portion immediately adjacent the bent serrated fin tips.

4. The method of claim 1 further comprising the step of twisting said fin stock at least 90° after serration and before forming a fused bond between said fin stock and said tube.

5. The method of claim 1 further comprising the step of removing any slack from said fin stock after serration and before forming a fused bond between said fin stock and said tube with a resiliently mounted roller.

6. The method of claim 2 further comprising the steps of guiding and supporting the major fin portion's tips with a forging wheel having a peripheral surface adapted to engage the tips of said fin stock and a pair of flanges adapted to extend along the sides of said fin stock.

7. The method of claim 2 further comprising the step of twisting said fin stock at least 90° after serration and before forming a fused bond between said fin stock and said tube.

8. The method of claim 7 further comprising the step of removing any slack from said fin stock after serrration and before forming a fused bond between said fin stock and said tube with a resiliently mounted roller.

9. The method of claim 8 further comprising the step of insulating and supporting the fin stock adjacent said contact area with a ceramic contact means and serrating the fin stock without substantially removing any fin stock material.

10. The method of claim 1 further comprising the step of insulating and supporting the fin stock adjacent said contact area with a ceramic contact means including a flange support member positioned within a plane containing said serrated fin portions, said flange support member supporting said lower side contact area.

\*　　\*　　\*　　\*　　\*　　\*

## THE PRIOR ART

### 1. *The Dengensha Catalog*

The trial court considered significant a commercial catalog which was a product of the Dengensha Company of Hiroshima, Japan. The catalog was distributed publically in the latter part of 1967. The trial judge found that it disclosed a finned tube consisting of a helically wound, I–type segmented fin stock continuously welded on its inner edge to a cylindrical tube by the high frequency resistance method. Thus it incorporated all of the elements of the patents in suit. There was some controversy as to the type of finned tubing the catalog showed and there was conflicting testimony at the trial. The trial court found, however, that the catalog illustrates helically wound, I–type segmented finned tube continuously welded by the high frequency resistance method. This catalog was not presented to the Patent Office during the consideration of the patents in suit.

### 2. *The Thermatool Machine*

Both parties had licenses for use of the Thermatool machinery, a welding apparatus with appurtenant equipment on which Boose manufactured the I–type serrated fin tubing. The apparatus itself consisted of a high frequency generator, with electrical leads and contacts, and a forging form drive. Nor was this device presented to the Patent Office. In 1968, Escoa was granted a license to use the Thermatool apparatus for high frequency welding under certain patents owned by AMF Thermatool. These were the Rudd patent 2,821,619; the Morris patent 3,047,712; and the Morris and Rudd patent 3,362,058. The Thermatool equipment and the mentioned patents educated Escoa on the nature and character of the prior art.

### 3. *The Morris '712 Patent*

U.S. Letters Patent No. 3,047,712 was issued to Jack Morris in 1962. It discloses a method for welding helically wound I–type solid finned tubing by the high frequency resistance method. The patent describes a problem encountered in high frequency welding of finned tubes:

> The welding of metal strips on edge with respect to a curved surface on another metal member such as the exterior of a cylinder or tube has heretofore involved a serious difficulty which has not been heretofore satisfactorily overcome in cases where the strip has a substantial transverse dimension, that is, a relatively significant height, so that it tends to wrinkle or become otherwise objectionably distorted as it is pressed against the curved surface of the other member or wrapped around the latter.

The wrinkling tendency referred to above is avoided by the method described in the Morris '712 patent. This is accomplished by a certain diagonal positioning of the high frequency electrical contacts during welding, and specified placement of the forging wheel and spiral wrapping equipment. The method requires in part that the high frequency electrical contact on the fin be placed on its upper edge remote from the weld point. When the fin and the tube come into contact, the tube contact being shortly in advance of the weld point, the fin is heated from its upper edge to its lower edge by the diagonal path of the current

which facilitates the stretching and bending involved when the fin is wound around the tube and thereby avoids the wrinkling effect. Also disclosed by the patent is the application of rollers to the annealed edge.

### 4. The Rudd '619 Patent

The Morris patent was one which was licensed to plaintiff–appellant as was the Rudd '619, U.S. Letters Patent No. 2,821,-619, issued to Wallace C. Rudd, which disclosed a method of welding metal strips on edge to other metal strips or plates by the high frequency resistance method. This required that the fin electrical contact be placed on the lower edge. Both the fin contact and the plate contact are shortly in advance of the weld point. The patent discloses the use of a pressure roller above the weld point.

### 5. The Rudd '427 Patent

U.S. Letters Patent No. 3,427,427, issued to Wallace C. Rudd in 1969, disclosed various methods for high frequency resistance welding of I–type solid finned tubes.

### 6. The Morris, Wallace Rudd '058 Patent

This was issued to Jack Morris and Wallace C. Rudd in 1968, and was considered by the patent examiner along with the Morris '712 and the Rudd '619 and Rudd '427 patents described above. The Morris '058 patent disclosed two methods for high frequency resistance welding I–type serrated finned tubing. The patent addressed the wrinkling effect problem in the Morris '712 patent, and certain difficulties encountered in obtaining a continuous weld:

> Furthermore, oftentimes it is desired that the fin–forming strip be slitted or slotted transversely, except at the edge portions which are to be welded in place, such slits or slots permitting short portions of the strip to be either twisted or deflected to one side or the other in order to provide more effective radiating surfaces, or to promote turbulence in the surrounding heat transferring fluid. But when such slit or slotted fin strip material is so advanced that its said edge to be welded will form one side of the above–mentioned V–shaped gap, then by reason

of the presence of the slits, said edge will not tend to conform to a continuous smooth line in approaching the weld point, but instead will tend to conform to a succession of short straight lines, each at a slight angle with respect to the next succeeding one, so that the two sides of the V–shaped gap above mentioned, will not smoothly merge at the weld point, but the dimensions of the gap and the position of its apex, viz the weld point, will vary slightly and intermittently as a result of the presence of the slits in the strip, and this in turn will cause irregularities in the weld, all as more fully explained hereinafter.

The welding methods described by the Morris '058 patent are intended to overcome these problems: the first involves welding one side of serrated fin stock to the tube and then combing the fins up, so that the resulting fin is L–shaped in cross section. Another method requires use of L–shaped fin stock.

### 7. The J. W. Brown, Jr. and Robert W. Kaase '459 Patent

U.S. Letters Patent No. 3,377,459 teaches a method for welding solid finned stock to a tube. The trial court found that the patent disclosed all of the elements of the Boose '774 patent (in suit), except for the use of segmented finned stock. This patent was not cited to the patent examiner during the proceedings in issue. Appellants argue that other patents classified in the same class and subclass as the Brown '459 patent were presented to the patent examiner, who should be presumed to have had knowledge of this patent.

### 8. The Thermatool Pamphlet

The pamphlet was published by AMF Thermatool Corp. in 1965. It showed an I–type solid fin helically wound on a tube and welded by the high frequency resistance welding method. This pamphlet shows an isometric view of an I–type serrated fin and cross–sections of various types of I–type fins welded by the high frequency resistance process. It was the trial court's conclusion, supported by the

record, that the Thermatool Pamphlet showed that it is possible to wind I–type segmented fins helically around a tube and weld them using the high frequency resistance welding process. This pamphlet was not presented to the patent examiner at the time of the hearings.

9. *Other patents found by the court to be pertinent prior art*

The following were also considered pertinent by the court: U.S. Letters Patent No. 2,870,999 issued to S. H. Soderstrom in 1959 showed a heat exchanger unit consisting of segmented finned tubes, but the patent predates the development of high frequency resistance welding methods.

U.S. Letters Patent No. 3,436,517 issued to Edmond Pignal disclosed a welding process for making helically wound finned tubes with either solid or segmented I–type fins, and shows the use of a pressure roller.

British Patent Specification Number 1,007,243 disclosed a method of welding helically wound fin to a tube by high frequency welding technique.

French Patent Number 993,849, issued to Pierre–Georges Vicard in 1951, discloses an I–type serrated fin wound around a tube.

French Patent Number 1,330,292 issued to Biraghi S.A. in 1963, discloses the construction of a finned tube consisting of a tube having helically wound segmented fins on a tube.

## SUMMARY OF THE TRIAL COURT'S FINDINGS AND DECISION

The trial court found that the prior art teaches the ordinary person skilled in the art several methods for welding helically wound solid I–type fin stock to a tube by the high frequency resistance welding method.

Some of the other findings of the trial court follow:

That Escoa has been manufacturing helically wound, solid I–type finned tube welded by the high frequency resistance welding method since November 1968, when it put its first Thermatool apparatus into operation.

That the prior art teaches the ordinary person skilled in the art the concept of welding helically wound, segmented I–type finned tube by the high frequency resistance welding method. However, prior to 1969, when Mr. Boose first produced such a device, the method used as described in patent '774 had not been patented nor was the method specifically described in any prior art publications.

That Mr. Boose conducted a series of experiments performed on Escoa's Thermatool apparatus. These consisted of running a tube and serrated fin through the Thermatool apparatus. Adjustments were made in materials variants, such as tube size, fin height, depth of fin serrations, and in mechanical variants, such as electrical contact size and location, and amount of forging pressure from the pressure wheel. It was the cracking of the fin stock that caused the adjustments in materials and forging pressure to be made. The adjustment of the size and location of electrical contacts was made in response to a problem with the electrical current arcing through the serration. This arcing caused the welding tooling to burn up.

That Mr. Boose's method was ultimately set forth in claims 1, 2, 5, 6 and 7 of patent '774. The court said that "the serration of the fin stock is the only factor which distinguishes that method from the welding of I–type *solid* finned tubing by the high frequency resistance welding process."

That considering the scope and content of the prior art, and the level of ordinary skill in the art of high frequency resistance welding, the method set forth in patent '774 would have been obvious to an ordinary person skilled in the relevant art. The court said that I–type solid finned tubing is old in the art, high frequency resistance welding is old in the art, and serration of fin stock is old in the art.

That the characteristics of Mr. Boose's method which were new to the art were the adjustments that he arrived at by experimentation, that is, the size of the fin electrical contact, and the amount of forging pressure applied to the fin.

These factors, the court found, (the size of the fin electrical contact and the amount of forging pressure) are not set forth in the pertinent claims of patent '774, but that even if they had been set forth, these characteristics are not the products of patentable inventiveness, but, rather, the products of mechanical expediency.

As to patent '228, claims 1 and 2 consist of an aggregation of elements old in the art which perform no new or different function than that which they previously performed, and the subject matter of said patent would have been obvious to an ordinary person skilled in the pertinent art.

The court further found that the claims of '774 patent do not include two of the elements essential to practice the invention. The size of the fin electrical contact and the amount of forging pressure to be applied to the fin are not found in the claims. As Mr. Boose's method was ultimately set forth in claims 1, 2, 5, 6 and 7 of patent '774, the serration of the fin stock is the only factor which distinguishes that method from the welding of I–type solid finned tubing by the high frequency resistance welding process.

Finally, the court found that there were two material misstatements to the examiner. The examiner was not apprised of the Dengensha catalog or the Thermatool welding device. It was said that "While these were material omissions, the intent and the effect of such omissions has not been proven."

## I.

## DISCUSSION OF THE PRIOR ART ISSUE

The contention of Escoa is that the trial court erred in concluding that the presumption of validity which attends patents was weakened due to the fact that the Patent Office was not advised of two examples of prior art which were regarded by the trial court as being very pertinent, that is, the Dengensha Company catalog and the Thermatool apparatus.

Escoa does not dispute the principle that the presumption of validity enjoyed by every patent in accordance with 35 U.S.C. § 282 is weakened by evidence that the patent examiner did not have all of the relevant facts presented at the time the patent was issued. *Cathodic Protection Service v. American Smelting & Refining Co.*, 594 F.2d 499 (5th Cir.), cert. denied 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979); *Aluminum Co. of America v. Amerola Products Corp.*, 552 F.2d 1020 (3rd Cir. 1977). See *Beckman Instruments, Inc. v. Chemitronics, Inc.*, 439 F.2d 1369 (5th Cir.), cert. denied 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970); Rather, Escoa's reliance is on the affirmance of this principle by this court in *CMI Corp. v. Metropolitan Enterprises, Inc.*, 534 F.2d 874 (10th Cir. 1976). The opinion in *CMI Corp.* stated:

> When teachings in a prior art patent must be ignored in order to reach a desired result, they become less pertinent to the determination of obviousness. *Uarco, Inc. v. Moore Business Forms, Inc.*, 440 F.2d 580, 585 (7th Cir.), cert. denied, 404 U.S. 873, 92 S.Ct. 91, 30 L.Ed.2d 117; cf. *United States v. Adams*, 383 U.S. 39, 51–52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572, 580.
>
> Since more pertinent art was not ignored, the statutory presumption favoring validity was not weakened. *Uarco, Inc. v. Moore Business Forms*, supra, at 585 . . . .

The argument is that the trial court's error was in failing to specifically find that the two prior art examples which were cited were more pertinent to the issue of obviousness than the prior art examples which were considered.

All that Rule 52(a) Fed.R.Civ.Proc. demands is that the essential facts which lay a basis for the trial court's decision should be found. See *Amerline Corporation v. Cosmo Plastics Company*, 407 F.2d 666 (7th Cir. 1969); J. Moore, *Moore's Federal Practice*, § 52.06.

A recent decision of this court held that the introduction of highly relevant but unconsidered evidence of prior art requires a "fresh assessment of all the art–new and

old–" to be carried out by the trier of the fact without presumption of validity. *Sidewinder Marine, Inc. v. Starbuck Kustom Boats and Products, Inc.*, 597 F.2d 201, 206 (10th Cir. 1979).

■ In the case at bar the trial court did indeed state that the omitted prior art was very pertinent. Also, the findings themselves and the extent to which the judge considered the importance of the omitted examples together with the careful scrutiny given to the question as to the effect of the omission, tend to show that the cited examples were regarded by the trial court as more pertinent to the issue of obviousness than the prior art examples which were presented to the patent examiner. *See Solder Removal Co. v. United States International Trade Commission*, 582 F.2d 628, 65 CCPA 120 (1978). The omission of a specific finding making a comparison as to the relative strength of the prior art omitted we do not consider to have been error.

## II.

### THE QUESTION WHETHER THE BOOSE '228 PATENT WAS ANTICIPATED BY THE PRIOR ART

The trial court concluded that the Boose '228 article patent was anticipated by the prior art and was therefore not novel and was invalid. Anticipation and lack of novelty defeat the validity of a patent under 35 U.S.C. § 102(a) and (b), which provides:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

■ The test for anticipation in this circuit was considered in *Scaramucci v.*

*Dresser Industries, Inc.*, 427 F.2d 1309, 1313–1314 (10th Cir. 1970). In that case the court said that when a patent is being attacked under 35 U.S.C. § 102, the challenging party must prove by clear and convincing evidence that all of the elements of the invention or their equivalents are found in a single structure or description where they do substantially the same work in substantially the same way. It is universally held that a mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than previously performed or produced by them is not a patentable invention. *Scaramucci* also held that in order to establish anticipation where there is an aggregation of elements old in the art, it is sufficient that the prior art considered together discloses all of the claimed elements and that no new functional relationship arises from their combination. The test of whether a particular patent is a mere aggregation and invalid or a combination and valid has been variously stated. Generally, where elements old in the art are united in such a way that a new and useful result is secured or an old result is attained in a more facile, economical and efficient manner, there is a patentable invention.

■ In the present case the prior art, consisting as it does of several existing patents, together with the Thermatool machine and the Dengensha Company publication, were determined by the trial court to satisfy the above–described test. There can be no doubt but that this evidence supports a finding that the Boose patent is not novel. Prior art, particularly the Dengensha pamphlet, clearly alluded to the article, but was not precisely described.

Finally, it is not necessary to discuss the factual determination of novelty in detail because even if it is assumed that the trial court erred and that Boose patent '228 does satisfy the requirement of novelty, the patent is nevertheless invalid under the obviousness test contained in § 103. This latter test is somewhat broader than is the doctrine of anticipation in the prior art. It is

possible for the prior art not to render an invention anticipated. At the same time, it may make it invalid for obviousness. *See Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180 (7th Cir.), *cert. dismissed* 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971).

### III.

### THE QUESTION WHETHER THE TRIAL COURT ERRED IN CONCLUDING THAT THE BOOSE '228 PATENT AND THE BOOSE '774 PATENT WERE INVALID AS OBVIOUS

■ Escoa contends that the trial court's determination of obviousness as to both patents was erroneous. 35 U.S.C. § 103, the governing section, provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The standards for assessing obviousness have been clearly recognized in this circuit and elsewhere. *See Norfin, Inc. v. International Business Machines Corp.*, 625 F.2d 357 (10th Cir. 1980), and *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645 (10th Cir. 1980). The question is regarded as a question of fact depending on the analysis of the scope and content of the prior art, the differences between the prior art and the claims at issue and the level of ordinary skill in the pertinent prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Norfin, Inc. v. International Business Machines Corp., supra; Milgo Electronic Corp. v. United Business Communications, Inc., supra.*

The Supreme court in *Graham, supra,* sets forth the standards mentioned above, and it also recognizes that the ultimate question of patent validity is one of law. In that case the Court said:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of "Nonobviousness" A Nontechnical Approach to Patent Validity. 112 U.Pa.L.Rev. 1169 (1964).

383 U.S. 17–18, 86 S.Ct. at 694.

■ Needless to say, the trial court's findings and conclusions are upheld unless shown to be clearly erroneous. *See Norfin, Inc. v. International Business Machines Corp., supra; Rutter v. Williams*, 541 F.2d 878, 880 (10th Cir. 1976).

■ In order for an invention to meet the test of nonobviousness under § 103, it must represent an improvement in the prior art which demonstrates more ingenuity and skill than the work of an ordinary mechanic acquainted with the prior art. *Boutell v. Volk*, 449 F.2d 673, 677 (10th Cir. 1971); *Mott Corp. v. Sunflower Industries, Inc.*, 314 F.2d 872, 879 (10th Cir. 1963). *See Graham v. John Deere Co., supra*, 383 U.S. at 11, 86 S.Ct. at 690. The test just mentioned was first expounded by the Supreme Court as a general condition of patentability in 1851 in *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851). It was reaffirmed in *Graham v. John Deere Co., supra*. In *Atlantic Works v. Brady*, 107 U.S. 192, 199–200, 2 S.Ct. 225, 231, 27 L.Ed. 438 (1882), the Supreme Court said:

The process of development in manufactures creates a constant demand for

new appliances, which the skill of ordinary head–workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences.

The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures.

█ We agree fully with the trial court that Boose's efforts represented mechanical expediency which failed to rise to the level of patentable inventiveness. *See Scaramucci v. Dresser Industries, Inc.*, 427 F.2d 1309, 1317 (10th Cir. 1970).

The trial court made extensive findings with respect to the prior art, the level of skill of an ordinary person experienced in high frequency resistance welding, and the difference between Boose's product and the prior art as required by *Graham*. It found that the only distinguishing feature of Boose's method set forth in the '774 patent was the use of serrated fin stock, and that the only other distinguishing features of Boose's method were the size of the fin electrical contact and the amount of forging force which were not the result of patentable inventiveness, but, rather, mechanical expediency. These elements were not claimed in the Boose '774 patent.

Escoa contends that the key difference between Boose's product and the prior art

was the welding of serrated finned tubing in such a way as to produce a continuous weld. Escoa's own expert witness, Dr. Savage, testified to the contrary. He said that the character of the weld as disclosed in the Boose '228 patent was not different than that used in the prior art for welding solid finned tubing. Dr. Savage acknowledged that the only difference between the Boose '228 patent and the prior art was the use of segmented finned stock.

The record supports the trial court's findings of fact. The court's conclusions are in accord with the basic law set forth in § 103 and in the cases pertaining to invalidity because of obviousness.

## IV.

THE QUESTION WHETHER THE NEGATIVE TEACHINGS IN THE PRIOR ART LEADS TO A CONCLUSION DIFFERENT FROM THAT WHICH IS SET FORTH IN PART III ABOVE

The Escoa argument on this is that the trial court ignored the negative teachings of the prior art and, particularly, those contained in the Morris '058 patent in determining the question of obviousness. Escoa's reliance is on *Application of Mercier*, 515 F.2d 1161, 1166 (CCPA 1975), and *United States v. Adams*, 383 U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). It is argued that teachings which would lead a person having ordinary skill in the art away from the claimed invention are relevant in determining obviousness. *See Application of Mercier*, supra.

█ The *Adams* case states the rule as follows: "[K]nown disadvantages in old devices which would naturally discourage the search for new inventions may be taken into account in determining obviousness." 383 U.S. at 52, 86 S.Ct. at 714. *See also John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547, 551 (5th Cir. 1980); *Application of Marshall*, 578 F.2d 301, 304 (CCPA 1978); *W. L. Gore & Assoc. v. Carlisle Corp.*, 529 F.2d 614, 619, 41 A.L.R.Fed. 941 (3d Cir. 1976); *Gettelman Mfg., Inc. v. Lawn 'N Sport Power Mower Sales & Ser-*

vice, Inc., 517 F.2d 1194, 1199 (7th Cir. 1975). The trial court recognized that the teachings of the Morris '058 patent were to the effect that use of I–type serrated fin stock helically wound around a cylindrical tube causes the edge of the fin stock to conform to a series of straight lines rather than a continuous curve, and that this would cause irregularities in the weld. The trial court seemingly took into account the teachings of the Morris '058 patent in producing the so–called "Morris effect." The record supports the conclusion that the "Morris effect" did not discourage Mr. Boose. Boose stated that he was not discouraged by any prior opinions as to feasibility of manufacturing I–type serrated finned tubing on the Thermatool machine. His conclusion was that the "Morris effect" was merely a problem of geometry which was subject to being overcome by proper selection of parameters such as the depth of the segment cut and the diameter of the tube. From this it is inferable that the teachings of Morris '058 are less negative than Escoa contends.

## V.

### THE RELEVANCY OF SECONDARY CHARACTERISTICS

The Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), recognized that it was relevant to consider the elements of prior experimentation and failure together with long–felt need in the industry and commercial success in determining obviousness. Because of the practical nature of these factors, they are helpful to courts since they deal with economic and other motivational factors rather than technical problems. They also serve to prevent use of hindsight and prevent the reading into the prior art of the teachings of the invention in issue. 383 U.S. at 36, 86 S.Ct. at 703. In the *Graham* case the Supreme Court said: "However, these factors do not, in the circumstances of this case, tip the scales of patentability." 383 U.S. at 36, 86 S.Ct. at 703.

■ *Graham* recognizes that these secondary characteristics are merely one relevant factor in a determination of obviousness. They are not, however, a test for patentability. Invention is, of course, an essential element. *See Anderson's Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Great A. & P. Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The secondary characteristics do not change the basic inquiry which is the scope and content of the prior art, differences between the prior art and the claims at issue, and the question of ordinary skill in the pertinent art. *See Graham v. John Deere Co., supra.*

This court has recognized that the need for recognition of secondary evidence is an evidentiary question which the trial court must determine. *Potter Instrument Company, Inc. v. Odec Computer Systems, Inc.*, 499 F.2d 209, 211 (1st Cir. 1974). The Supreme Court has held that lack of invention is not to be ruled outweighed by secondary factors. *Dow Chemical Co. v. Halliburton Oil Well Cementing Co.*, 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973 (1945). *See also Halliburton Co. v. Dow Chemical Company*, 514 F.2d 377, 379 (10th Cir. 1975).

■ In summary, then, the presence of secondary characteristics does not result in a finding of nonobviousness and is not inconsistent with the ruling that a patent is invalid under § 103 because of obviousness. Such factors shed light on the primary issue whether a claimed invention was obvious to one skilled in the art. They do not provide a substitute for that test.

Finally, it can be said that the secondary considerations evidence is not strong. The evidence of the presence of the secondary factors in the record is weak, and the record does not reveal long, arduous attempts in the industry to achieve the result which Boose attained. Also, there is not significant evidence of long–felt need.

Finally, the presence of evidence of secondary considerations does not overcome a finding of obviousness based on the *Graham* standards.

Our conclusion is that the trial court correctly exercised its discretion in finding that the claimed inventions were obvious.

\* \* \*

We have considered the argument of Escoa that the trial court failed to view the patents in suit in the aggregate, and erred in failing to conclude that, considered as a whole, the several elements performed a new and different function.

The Supreme Court in *Great Atlantic & Pacific Tea ·Co. v. Supermarket Eq. Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) considered the issue raised by the combination or aggregation of old parts. It said that where the combination performs no new function different from that which was performed before, it is not a patentable invention. The Supreme Court on that occasion said:

> Courts should scrutinize combination patent claims with a care proportionate to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. . . .

340 U.S. at 152, 71 S.Ct. at 130.

The standard which is set forth in *Great Atlantic & Pacific Tea Co.* is well recognized. *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Deere & Co. v. Hesston Corp.*, 593 F.2d 956 (10th Cir.) *cert. denied* 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49; *True Temper Corp. v. CF&I Steel Corp.*, 601 F.2d 495 (10th Cir. 1979).

The trial court was fully aware of the foregoing principle. Also, the record fully supports Finding 76 that the aggregation of old elements in the art failed to perform any new or different function. *See Sidewinder Marine v. Starbuck Kustom Boats, etc.*, 597 F.2d 201 (10th Cir. 1979). The issue is whether the subject matter as a whole, the particular use or result of the assembly of old elements, would have been obvious to one with ordinary skill in the art at the time discovery was made. *Plastic Container Corp. v. Continental Plastic of Oklahoma*, 607 F.2d 885 (10th Cir. 1979), *cert. denied* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980).

It cannot be said that the prior art as compared with the claimed invention presents a difference sufficient to render the claim nonobvious to one reasonably skilled in the art. The record supports the trial court's Finding 75 that the distinguishable characteristics of the method patent were not products of patentable inventiveness, but, rather, were products of mechanical expediency. The subject matter of the article patent would have been obvious to an ordinary person skilled in the pertinent art. (*See* Finding No. 76.).

\* \* \*

The trial was carefully and ably conducted by Judge Dale Cook.

The judgment is affirmed.