**TRI–COLLAR, INC.**

v.

**REAMCO, INC., A DIVISION OF SUN OIL COMPANY.**

**TRI–COLLAR, INC., and Bill G. Parker**

v.

**LOR, INC.**

Civ. A. Nos. 781482, 791548.

United States District Court,
W. D. Louisiana,
Lafayette-Opelousas Division.

April 21, 1982.

Guy E. Matthews, Hyer, Matthews & Reiter, Houston, Tex., Bob F. Wright, Domengeaux & Wright, Lafayette, La., for plaintiffs.

William M. Bass, Voorhies & Labbe, Lafayette, La., C. James Bushman and Margaret Anderson, Browning, Bushman & Zamecki, Houston, Tex., for defendant, Reamco, Inc., a Division of Sun Oil Co.

Jack W. Hayden, Houston, Tex., Edward Taulbee, Lafayette, La., for defendant, Lor, Inc.

## OPINION

SHAW, District Judge.

Plaintiffs are Bill G. Parker, patentee, and Tri-Collar, Inc., exclusive licensee. The defendants are LOR, Inc. and Reamco, Inc., a Division of Sun Oil Company. Parker claims that he is the original and first inventor of a unique bottom hole stabilizer tool used in the drilling of oil wells to prevent wall sticking of drill collars and to enable proper and better drilling through the use of packed or bottom hole assemblies. The stabilizer invention was filed as a United States Patent Application in the United States Patent and Trademark Office on November 18, 1969, and issued as United States Patent Number 3,645,587 on February 29, 1972.

The plaintiffs allege that defendants have infringed Claims 1–3 and 5–9 of the Parker patent and seek to have the patent held valid, enforceable and infringed. Defendants deny these claims and ask the Court to declare the patent invalid and award attorney fees to the defendants under 35 U.S.C. § 285.[1]

### Background

The tools involved in this lawsuit, including the prior art tools, can be divided into three general categories: stabilizers, drill collars, and reamers.

The stabilizers with which this lawsuit is concerned with respect to the patent in suit, generally have a central tubular body to which are attached ribs or blades which extend outwardly to engage the walls of the bore hole and thereby centralize a drill string and bit in the center of the hole. The outside diameter of the blades or ribs is traditionally slightly smaller (usually about 1/16″ smaller) than the gauge of the bore hole. This slight undersizing minimizes reaming of the bore hole by the ribs or blades and likewise minimizes the torqueing effect of the stabilizer. While these rib or blade-type stabilizers may, in theory, cause some reaming of the bore hole, just as the rotation of any tool downhole including drill pipe may do, their fundamental purpose is not to ream but to centralize the drill string.

---

1. 35 U.S.C. § 285 provides:
 "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

The fundamental purpose of conventional drill collars is to place weight on the drill bit to cause it to penetrate the formations. Traditionally, drill strings have included a long upper section of drill pipe and a shorter lower section of drill collars. The string is suspended in the hole so that the upper section of drill pipe is under tension while the drill collars are under compression. The rotating drill collars, if permitted to lie against the bore hole, will wear it away and thereby theoretically perform a "reaming" function although this is not the fundamental purpose. While conventional drill collars are round in cross section, special square drill collars have been used in the past, primarily in packed hole assemblies.

Conventional reamers, as the name connotes, are drilling tools connected in a drill collar string to ream out the walls of the bore hole above the bit to maintain the hole at gauge. Typically, they include a short tubular body which can be screwed into the drill collar string and usually have three rollers spaced about their periphery which perform the reaming function. Since the roller reamers engage the wall of the bore hole at three equally spaced points, they necessarily keep the bit centered in the bore hole. While the blade or rib-type stabilizers and the roller reamers both have a bit centering function, the stabilizers perform this function with only incidental "reaming" caused by rubbing of the blades or ribs against the bore hole, while the roller reamers are designed to deliberately ream the walls of the bore hole. This difference becomes particularly significant in the drilling of deviated wells in relatively soft formations as is common in the Gulf Coast area. These deviated wells commonly use packed hole assemblies and when their reamers are used to pack the hole, the drill collar string lies on the low side of the deviated hole and the reamers tend to ream more deeply on the low side thereby tending to cause the direction of the hole to veer downward.

A packed hole can be defined as a bottom drill stem assembly that engages the hole wall at several different points above the bit so as to guide the bit in the direction already established. A drill string in a packed hole assembly utilizes drill collars to place weight on the bit. A stabilizer, in a sense, is a drill collar since it also places weight on the bit but stabilizers will have three or more blades or ribs that come in contact with the well bore. For packed hole drilling, the use of several stabilizers will greatly increase the stiffness of the lower drill collar string and prevent rapid change of the hole angle.

For many years, it has been recognized that long, stiff, "hole size" bottom stabilizing assemblies, properly utilized, can restrict hole deviation, even in deep, ordinarily troublesome wells, resulting in a reduction of drilling time and assuring a straight hole. It has been estimated that proper applications of packed hole techniques can eliminate up to 90% of the economic loss due to crooked holes.

"Balling up" of the mud and cuttings on the drill collar string has been a constant source of trouble in the industry. This is particularly true in a soft formation with the accumulation of "gumbo shell" around the blades of the stabilizer causing the drill string to stick resulting in delays in the drilling operations, expensive fishing jobs and sometimes the loss of the drill string which could have a value of one-third of the cost of the rig.

Various types of stabilizers have been in use for many years. For instance, Drilco Oil Tools, Inc., a company which specializes in oil field equipment and services, offered various welded blade stabilizers in the 1962–63 edition of the composite catalogue of *Oil Field Equipment and Services.* These stabilizers were designed to center drill collars in the hole and provide better alignment to the hole being drilled. The rotary blade was advertised as especially effective where "balling up" of the mud and cuttings on the drill collar string may be a problem. See Exhibit 1, p. 674.

**DRILCO OIL TOOLS, INC.** **MIDLAND, TEXAS**

## WELDED BLADE STABILIZERS

Welded Blade Stabilizers are designed to center the drill collars in the hole and provide better alignment to the hole being drilled. The rotating blade is especially effective in soft formations where "balling-up" of the mud and cuttings on the drill collar string may be a problem.

The stabilizers are generally used for the following purposes:

1. For drilling in crooked hole areas
 a. Increases length of free drill collars above bit to produce greater pendulum effect and provide straighter holes using more weight. (Write for free tables on stabilizer placement.)
 b. For packed hole drilling, several stabilizers will greatly increase stiffness of lower drill collar string to prevent rapid changes of hole angle.

2. For preventing wall sticking—stabilizers hold surface of drill collar away from wall of hole.

3. For better hole alignment—stabilizers will keep drill collars centered in hole and prevent sidewise drilling of bit.

### CONSTRUCTION and SERVICE

BODY—Made of AISI 4145 alloy steel with connections precision "hob-cut."

BLADES—Made of mild steel and welded to body with closely controlled preheating of welded areas and stress relief of completed welds. All blades are hardfaced with tungsten carbide.

MAINTENANCE—All blades can be built-up by field welder and use of a ring gage. The mild steel ribs permit build-up without danger of cracking in welded areas.

WASHOVER OF STABILIZER—In case drill collar string is stuck in hole, mild steel ribs can be cut off with tungsten carbide coated milling shoe. Hardfacing is placed on OD of ribs only in order that it will not interfere with milling operation in cutting-off ribs.

Price of stabilizer is determined by hole size and body OD.

*Straight Rib* *Spiral Rib*

**Fig. 1**

**Fig. 2**

| Hole Size | Overall Length | Blade Length | APPROXIMATE WEIGHTS FOR RECOMMENDED DRILL COLLAR SIZES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 4¼ | 4¾ | 5¼ | 5¾ | 6¼ | 6½ | 6¾ | 7 | 7¼ | 7¾ | 8 |
| 5½—6¼ | 37 | 10 | 115 | 150 | | | | | | | | | |
| 6⅛—6¾ | 37 | 10 | 140 | 155 | 175 | | | | | | | | |
| 7¼—7¾ | 41 | 10 | | | 210 | 245 | 295 | 305 | | | | | |
| 8½—9 | 43 | 12 | | | 220 | 270 | 320 | 330 | 340 | | | | |
| 9½—9¾ | 44 | 12 | | | | | 335 | 345 | 360 | 390 | 420 | 465 | 495 |
| 10¾—11 | 47 | 13 | | | | | | 400 | 410 | 445 | 470 | 510 | 545 |
| 12—12¼ | 48 | 14 | | | | | | | 440 | 475 | 490 | 555 | 585 |
| 13¾ | 49 | 15 | | | | | | | 485 | 520 | 545 | 600 | 635 |
| 15 | 50 | 16 | | | | | | | 520 | 555 | 580 | 625 | 695 |
| 17½ | 52 | 18 | | | | | | | 600 | 635 | 660 | 725 | 770 |
| 20 | 54 | 20 | | | | | | | | | 745 | 815 | 850 |
| 24 | 54 | 20 | | | | | | | | | 840 | 900 | 940 |
| 26 | 54 | 20 | | | | | | | | | 890 | 940 | 950 |

1. Rib diameter is normally ¼″ smaller than hole size. Other clearance can be furnished on customer specification.
2. Body diameter should be same as drill collar string. Specify body diameter and connection size.

(Continued on Next Page)

EXHIBIT 1

Parker worked for Drilco from 1959 until February of 1968, as a salesman and drill collar inspector. During that time, he sold spiral and straight three-blade welded stabilizers and contends that they would ball up. About the time Parker left Drilco, he claims that he conceived the stabilizer invention covered by the patent in suit. Parker claims that his invention solves the problem of balling up by allowing a larger annular area for the flow of drilling fluids around the annulus of the tool and at the same time, greater wall contact with a fewer number of rib sections and the flow area extends for the entire length of the tool. In addition, the characteristics of the invention allow fast drilling operations such as in offshore formations.

The Parker stabilizer is formed from a tubular blank by milling three straight longitudinal grooves into the circular surface of the blank. The grooves are milled by simply removing material from the blank. Thus, the particular shape of the product, triangular in cross-section, plays an important part in the formation of the tool. See Exhibit 2, p. 13.

In February or March, 1968, Parker claims that he made a rough sketch of his invention and paid Jimmy Reese, a draftsman, $50 to prepare drawings of the stabilizer. Shortly thereafter, Parker took the drawings to Brown Tool and Supply in Odessa, Texas, but Brown was unable to build the tool. Attempts to have the tool built at Hunt Tool Company (May-July, 1968) and Prager Machine Shop (August-November, 1968) were also unsuccessful. In February of 1969, Parker presented the drawings to his old company, Drilco, and on May 31, 1969, Drilco invoiced Parker for his first triangular stabilizer (PK–301), which was lost in the hole on its first job. Drilco never returned the original drawings to Parker. Parker went into business for himself and operated under the name of "Parko, Inc.". After the patent was issued in 1972, Parker licensed Tri-Collar, Inc. to manufacture, use, lease and/or sell stabilizers covered by the patent in suit. Tri-Collar, the licensee, has been very successful with the Parker stabilizer. Gross revenues from 1975 through 1981, have increased from $185,000 to $3,600,000 and the Parker stabilizer has accounted for at least 85% of these revenues. Plaintiffs contend that Tri-Collar, Inc.'s business would have increased more but for the infringements of the defendants.

*Will the Real Inventor Please Stand Up*

During the trial, James Reese intervened as a party plaintiff claiming equitable ownership to the patent in suit on the ground that he is the sole and original inventor of the triangular stabilizer and conceived the invention in early 1968, while inspecting stabilizers at Lower Coast Corporation, Inc. Reese contends that he made and gave Parker the drawings in March or April, of 1968, when they both worked for Brown and Root. Reese stated that he dropped the project when Parker returned from Odessa, and first told Reese that the machine shop could not make the stabilizers and later told Reese that such a triangular stabilizer had already been patented.

Parker denied Reese's version of the arrangement and two recorded tapes of statements by Reese completely discredited Reese's entire testimony. Thereafter, Reese's attorney withdrew from the case and on motion of plaintiff, the Court dismissed the intervention. After a weekend of "soul-searching", Reese returned to Court and testified that the real truth was that both he and Parker had jointly and independently conceived the idea of the triangular drill collar and compared ideas, all of which resulted in the invention.

Mr. Alton Robicheaux was called as a witness by the Court and testified that Reese had disclosed the triangular drill collar to him in early 1968, while he was employed at Lower Coast Corporation.

About two weeks later, Reese showed him a drawing which conforms in all respects to the Parker stabilizer. If Parker's original testimony is correct to the effect that he first conceived the invention in March or April, of 1968, had Reese made the drawings a few days later and within a week, he had left for Odessa, then Robicheaux's testimony would establish a conception date by Reese prior to that of Parker. But, Parker later corrected his original testimony and settled on February of 1968, as a conception date.

In addition to Reese's inconsistent statements, his failure to take any action or make further inquiries after receiving his version of Parker's explanation as to why Parker's efforts to develop the tool were discontinued would lead the Court to believe that Mr. Reese was not the inventor or co-inventor. It is true that Parker, on more than one occasion, refined the dates of various events and was far from precise as to the periods of time when conception occurred, but it must be remembered that he has been called upon to reconstruct dates and events that transpired over a decade ago. Therefore, the Court finds that, as between Reese and Parker, Parker would be the first and only inventor and he conceived the invention around February of 1968. The Court also finds that Parker was diligent in his attempts to reduce the invention to practice.

### The Claims of Parker Patent U. S. No. 3,645,587, February 29, 1972

The claims of Parker Patent U. S. No. 3,645,587, read as follows:

"1. An improved elongate member for use as a bottom hole stabilizer in a packed hole assembly for a drill string, said elongate member having a transverse cross-sectional configuration generally in the form of a triangle, and said elongate member having an outside surface configuration which includes three equally spaced-apart rib sections which are substantially straight and longitudinally aligned parallel to a center axis of the elongate member, and said elongate member further having three flow areas formed between said three rib sections for the full length of said member so as provide for a circulation of drilling fluid and cuttings between a well bore and said member.

2. The improvement of claim 1 wherein said rib sections and said annular flow areas are formed by milling three straight, longitudinal grooves in equally spaced positions into the surface of a steel blank having a circular outside configuration when viewed in cross section.

3. The improvement of claim 2 wherein said elongate member is formed from a tubular blank having a bore therethrough.

4. The improvement of claim 1 wherein said rib sections are faced with a wear-resistant material.

5. The improvement of claim 1 wherein said elongate member is provided with threaded end portions for connecting the member into a drill string.

6. The improvement of claim 1 wherein said three rib sections have rounded surfaces for contacting the wall of a bore in a drilling operation.

7. The improvement of claim 1 wherein said annular flow areas are defined by flat-bottomed grooves milled into the surface of said elongate member, and wherein said rib sections are defined by unmilled sections left between each of the milled grooves.

8. A method for forming an integral elongate member having three straight, spaced-apart rib sections longitudinally positioned on an outside surface of the elongate member together with three straight annular flow areas positioned be-

tween the three rib sections, comprising the steps of

milling three spaced-apart, flatbottomed grooves in substantially straight paths along the outside surface of an elongate tubular blank having a circular outside periphery in cross section, said milling being to a sufficient depth to provide substantial flow area for the entire length of the elongate blank while at the same time leaving relatively broad rib section surfaces for wall contact in a drilling operation,

applying wear-resistant facings to said rib section surfaces, and

forming threaded connection means at opposite ends of said elongate blank so that the finished member can be connected to a drill string as a bottom hole stabilizer in a packed hole assembly.

9. The method of claim 8 wherein the width of each flat bottomed groove, when viewed in transverse cross section is approximately two or three times longer than the corresponding width of each rib section."

### The Prior Art

 To say the least, the case involves a field of very crowded art. Defendants contend that the claim language should be given the broadest possible construction. If the Court would follow this line of reasoning, then clearly each and every claim of the Parker patent would read on several pieces of the prior art rendering all claims invalid. See Defendant's Exhibit 19. It is axiomatic patent law that improvement patents in a crowded art are to be construed narrowly. *Harrington Manufacturing Co., Inc. v. White*, 475 F.2d 788, 796 (5th Cir. 1973), and with this principle of claim construction in mind, the Court, in examining the patent claims, will construe them nar-

rowly so as to avoid the prior art to the extent that such a construction can be reasonably adopted.

 At the outset, the Court will reject as references, the patent to Lari, filed June 18, 1968, and issued August 25, 1970, and the patent to Feenstra, filed July 7, 1969, and issued April 20, 1971. Since the Court has found that Parker, the applicant, first conceived his invention in February of 1968, and subsequently met the diligence requirement of Section 102(g), his invention occurred at the time of conception rather than at the time of reduction to practice. Section 102 provides in pertinent part:

"A person shall be entitled to a patent unless—

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. *In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.*" (Emphasis ours)

The pertinent language in the statute is a codification of older interference law which held that for purposes of priority between two inventors, a party may establish the date of conception as the date of invention, if conception was followed by reasonable diligence toward reduction to practice. See *Automatic Weighing Mach. Co. v. Pneumatic Scale Corp.*, 166 F. 288 (1st Cir. 1909).

Further, Lari is more like a drill collar than a stabilizer as there is no contact with the well bore. If the blades were extended to create a stabilizer, it would not allow for an adequate flow area. Defendants contend that all stabilizers are undergauge

(smaller than the bit) and Lari would work about as good as a worn out stabilizer. Plaintiff contends that Feenstra is a reamer and doesn't function as a stabilizer, and is a non-integral tool. Only the pads of the drill bit make wall contact. In any event, there is an abundance of prior art cited and uncited that is as relevant as Lari or Feenstra.

■ If the prior art cited by the defendants is no better than the art considered by the patent examiner, the presumption of validity will not be affected. In the Court's opinion, the patent to Garrett is by far, the most pertinent cited prior art brought to the attention of the patent office. The defendants contend that Claims 1, 2, 3, 4, 5, 6, and 8, read on Garrett and are invalid. Although Garrett presents three helical rib sections, Column 4, lines 15–24, anticipates an annular flow area with three straight longitudinal grooves. Lines 15–24 provide:

> "It is to be noted that because the blades are helical and the grooves are longitudinal and, hence, transverse to the blades, any desired groove spacing can be used as may be needed to provide strength and prevent cracking. This would not be the case if the grooves ran the same way as the blades, either with both longitudinal or both helical, where the spacing would be limited by the width of the blade which in turn is limited by the need for adequate fluid passage formed by the spaces between the blades."

Garrett also recognizes in Column 3, lines 33–34, that the body of the blades may be milled from an upset drop forging. Therefore, by following the disclosures as set forth above, you could change the Garrett helical blades to run longitudinal and parallel to the grooves and end up with a tool of similar configuration to the Parker tool. The plaintiffs' position is that Garrett just doesn't reveal a straight three-blade stabilizer. The Court recognizes that one skilled in the art is a very knowledgeable person but the Garrett patent, in the Court's opinion, is nonanalogous prior art. The fact that Column 4, lines 15–24 may be clear when viewed in retrospect in an attempt to pick a patent apart does not mean that it was obvious when written.

■ The other cited prior art, Bodine and Terry, do not anticipate Parker. The flow area in Bodine does not run the length of the elongated member and Terry, a four-bladed drill collar, does not disclose the combination of the Parker invention. Defendants contend that if you take the four-blade Terry drill collar and convert into three blades as taught by Bodine, you have obviousness. The Court is not convinced.

Plaintiffs claim that the Scarborough patent 3,237,427 is similar to a square drill collar and does not instruct on how to make or use the Parker three-blade stabilizer. Scarborough is more suited for use in hard rock formations where stiffness is required. Defendants correctly contend that Scarborough meets practically all of the elements of the claims in the Parker patent. However, Scarborough, like Terry, is a square drill collar and although the ribs are straight and equally spaced, they are not triangular in configuration and thus fail to provide added flow area as described in the Parker patent which is a functional difference.

The Wright patent is not analogous prior art as the width of the flat bottom grooves is less than two times longer than the corresponding width of each rib section. Defendants claim that the reamers function as ribs and therefore, act as a stabilizer. If the Court accepted this broad construction, then the claims of Parker, except for claim 9, read on Wright. But Wright is a well reamer. It is the cutters or rollers that engage the formation and in the Court's opinion, the lack of sufficient wall contact

would make Wright a poor stabilizer as compared to Parker when used in a soft formation.

The patent to Bobo will not be considered, as the defendants' expert witness, Professor Gambrell, concedes that is not prior art. The patent to Fox, likewise, may be eliminated as it is a special groove drill collar and does not instruct on how to make and use the Parker triangular straight-blade stabilizer.

The 1962–63 Drilco Composite Catalogue (see Exhibit 1, p. 674 hereof) would anticipate Parker if welding is equivalent to milling. Further, the grooves between the rib sections are not flat-bottomed as described in Claim 7 of Parker, but aside from these distinctions, the other claims of Parker read on the 1962–1963 Drilco Composite Catalogue.

Claim 1 of the Parker patent reads on the Drilco stabilizer in the following respects:

The elongated Drilco stabilizer is shown in Fig. 1 and the text specifically states that for packed hole drilling, several stabilizers will greatly increase stiffness of lower drill collar string to prevent rapid changes of hole angle; the triangular cross section of the Drilco stabilizer is shown in Fig. 2; the cross sectional configuration of the Drilco stabilizer which is used in packed hole assemblies clearly shows the three equally spaced apart ribs C (see Fig. 2); the ribs C are straight (see Fig. 1), while the longitudinal alignment is shown in both Figs. 1 and 2; three flow areas D are defined between the three ribs (see Fig. 2) and they extend for the full length of the elongate member (see Fig. 1).

Claim 2 of the Parker patent reads on the Drilco stabilizer in the following respects: The three straight rib sections and the flow areas between them are formed by welding the ribs to a circular blank, which is an equivalent of milling (see '587 patent in suit, Col. 1, 1. 72–75).

*Fig.1.*

12

22
22
14
16
22

22
22
14
14
16
22
22
14

2
22
22

22
22

22
22

22
22

24

14
16
16
14
14
22
22
22
22
22
22
22
10

*Fig.3.*

22

14

*Fig.2.*

22 14 18
19
16 16
20
22
22
14
17
19 16 18

3

x

PAAKEA

3,645,587

EXHIBIT 2

Claim 3 of the Parker patent reads on the Drilco stabilizer in that the elongated alloy steel body in the Drilco stabilizer is clearly tubular, note bore A in Fig. 2.

Claim 4 of the Parker patent reads on the Drilco stabilizer in that the rib sections C have hard facing on their outer surfaces (see Fig. 2).

Claim 5 of the Parker patent reads on the Drilco stabilizer in that the end portions B of the elongate member of the Drilco stabilizer are threaded for connecting the member into a drill string (see Fig. 1).

Claim 6 of the Parker patent reads on the Drilco stabilizer in that the three rib sections of the Drilco stabilizer have rounded outer surfaces for contacting the bore hole (see Fig. 2).

Claim 8 of the Parker patent reads on the Drilco stabilizer in that the elongate member of the Drilco stabilizer is integral or equivalent with three straight longitudinal ribs C and three straight flow areas D between them; the manufacturing method is welding and equivalent of milling, which results in three straight grooves, however, the grooves are not flat-bottomed (see Fig. 2); the alloy steel body is clearly tubular as well as circular having a central bore A (see Fig. 2); the flow areas D are ample (see Fig. 2) and extend for the entire length of the elongate member (see Figs. 1 and 2) while the rib sections C have relatively broad outer contact surfaces (see Fig. 2); wear resistant hard facings are shown on the outer surface of rib sections in Fig. 2; threaded connections B are provided the opposite ends of the tubular body (see Fig. 1) and the text specifies packed hole assemblies as one use out of the resulting stabilizers.

2. 35 U.S.C. § 101 provides:

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

35 U.S.C. § 102 provides:

"A person shall be entitled to a patent unless—

Claim 9 of the Parker patent reads on the Drilco stabilizer in that the width of each groove D when viewed in transverse cross section (Fig. 2) appears to be approximately three times the width of the rib sections C.

The Court finds that the obligation of candor owed to the patent office was met. The burden is on the defendants to prove inequitable conduct by clear and convincing evidence. *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 494 F.2d 383 (6th Cir. 1974). Mere negligent omissions or misstatements to the patent office do not provide a sufficient basis for a finding of fraud or misrepresentation by an applicant for a patent. *Eudy v. Motor-Guide, Herschede Hall Clock Co.*, 651 F.2d 299 (5th Cir. 1981). Although the 1962–1963 Drilco catalogue was not cited to the patent examiner, Garrett was, and defendants contend that the independent claims of the Parker patent (1 and 8), clearly read on Garrett. Although Drilco, in the Court's opinion, is better prior art than Garrett, and may cost the plaintiffs their presumption of validity, the fact that Garrett was cited is sufficient to show that plaintiffs met the obligation of candor.

Plaintiffs' position is that the no-balling result of the Parker stabilizer is "unforeseen and unpredictable" and that "it is quite evident that the Parker stabilizer has a synergistic or unpredictable result". (Plaintiff's Posttrial Brief—pp. 15–16).

The Court feels that in order to bypass the Drilco stabilizer as prior art, the plaintiff must prove that the combination is synergistic.

### Validity of the Patent

The requisites for a valid patent are statutory (35 U.S.C. §§ 101, 102, and 103),[2] as

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and require that the invention:

1. Be new or novel;

2. Be useful; and,

3. That the difference between the prior art and invention not be such as to be obvious to persons skilled in the art at the time the invention was made.

Most patents are granted for improvements of prior devices, *General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 368, 58 S.Ct. 899, 82 L.Ed. 1402 (1938), and the improved device will inherently achieve the same basic result and perform the same basic function as that performed by the prior device. *Nickola v. Peterson*, 580 F.2d 898 (6th Cir. 1978). Yet, it may constitute a "new and useful improvement" entitled to the protection provided by our patent laws. A requirement for a new function would nullify the statutory provision for patenting improvements which necessarily perform the old function of the now improved device. The amount of newness and usefulness need be only miniscule to avoid a finding of lack of novelty.

However, novelty does not exist if a patented device is anticipated by a substantially identical device whose elements perform substantially the same work in substantially the same manner. *Dunlop Co. v. Kelsey-*

*Hayes Co.*, 484 F.2d 407, 414 (6th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974); *Monroe Auto Equip. Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 414 (6th Cir. 1964). *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 616 (6th Cir. 1978).

### *A Non-Obvious Synergistic Result or Does Two Plus Two Equal Five?*

A patent may not be obtained if the difference between the subject matter as a whole would have been obvious at the time the invention was made, to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103. The Supreme Court has held that Section 103 was intended to codify the requirement of nonobviousness formulated over a hundred years ago in *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851). Further, the Court will not uphold the validity of a patent if the improvement is the work of the skillful mechanic rather than that of the inventor. Section 103 cannot be easily satisfied by inventions that rearrange old elements in new combinations with each element performing the same function it performed in the prior art, even though the new combination produces a more striking result than the old ones or makes something stronger than it was before. Unless the combination

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

35 U.S.C. § 103 provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

is synergistic, that is, resulting in an effect greater than the sum of the several effects taken separately, it cannot be patented. *St. Regis Paper Co. v. Bemis Co., Inc.*, 549 F.2d 833, 839 (7th Cir. 1977); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976), *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). Synergism is not the *sine qua non* of patentability. The *Graham* analysis is the exclusive means by which to measure non-obviousness under Section 103, and by enacting that section, Congress expressly mandated non-obviousness, not synergism, as the sole test of patentability. However, synergism may be an indication of non-obviousness. The synergistic approach may come into play in dealing with a combination of old elements when the very choice of the elements to be selected is not obvious. Synergism has been criticized because it centers exclusively on the performance of the elements after combination and without regard to the obviousness or non-obviousness of the making of the combination. Nevertheless, *Black Rock*, and *Sakraida*, supra, recognize synergism to a limited extent as a term symbolizing the more stringent standard for combination patent claims. The Supreme Court did not intend to reduce emphasis on the *Graham* analysis for obviousness under Section 103, but merely said that synergism is a symbolic reminder of what constitutes non-obviousness when a combination patent is at issue. See *Smith v. Acme General Corp.*, 614 F.2d 1086 (6th Cir. 1980). The standard to be applied when a patent involves a combination of elements found in the prior art is clearly set forth by Judge Fay in the Fifth Circuit decision of *John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547 (5th Cir. 1980), at 551:

"When the patent involves a combination of elements found in prior art, the claims are scrutinized 'with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.' *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed.

162 (1950). *See Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). The combined elements must perform a new or different function, produce 'unusual or surprising consequences,' or cause a synergistic result. *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.*, 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969); *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. at 151–53, 71 S.Ct. at 129–30; *Parker v. Motorola, Inc.*, 524 F.2d [518] at 534 [1975]. Long-accepted factors that deter investigation, known disadvantages which discourage the search, and disbelief by experts in the combination's success are indications of a patentable combination. *United States v. Adams*, 383 U.S. [39] at 52, 86 S.Ct. [708 at] 714 [15 L.Ed.2d 572 (1966) ]."

A patent's claims are the sole measure of the monopoly granted and are to be construed in the light of the specifications and the drawings. *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Claims should be construed liberally to uphold the patent's validity. However, the policy favoring liberal construction of the patent claims goes only so far. More must be done than to utilize the skill of the art in bringing old tools into new combinations. Only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Therefore, it must be shown that the combination took on some new quality or function from being brought into concert. If the combinations were known in the prior art and when put together, they performed the same function that they had been known to perform, there can be no patent. If the total only produced results more striking than any previous utilization, that result is not patentable as scores of progressive ideas in business are not patentable. However, a combination would be patentable if it produced a result other than the anticipated sum of the separate parts, or if a person skilled in the art would not be expected to combine the parts when looking for a solution to the problem.

■ Elements may, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. In this case the question is not whether the pieces of the prior art could be put together to make an anticipation or an obvious rejection, but whether there is any teaching or disclosure in the prior art as to what purpose it would serve to put them together. The defendants' answer to that question is "no", as even now, they dispute the fact that the combinations that make up the Parker tool solve the problem of balling up.

■ The Court is hard pressed to find from the evidence that the Parker stabilizer solves the problem of balling up. It is only the testimony of plaintiffs that the Parker tool never balls up, backed up by secondary considerations that at least three companies have duplicated the tool since the Parker patent was issued and further, that the Parker stabilizer has enjoyed considerable commercial success. While copying may be powerful evidence of nonobviousness, nothing deters the competitor from borrowing from a product not covered by a valid patent. *Janex Corp. v. Bradley Time*, 460 F.Supp. 383 (S.D.N.Y.1978).

■ It is clear that the Parker tool consists entirely of a combination of parts or elements found in the prior art. A consideration of the claims, drawings and specifications and all parts of the writing reveal that the only difference set forth is that the triangular shape and its dimensions allow larger annular flow areas resulting in less danger of sticking and better stabilizer action. The fact that the blades are milled was not alleged to have played any part in solving the problem of balling up in the claims, specifications or drawings, the file wrapper or any parts of the writing.

It is conceded that a properly milled blade is stronger than an improperly welded blade that may become detached and cause a problem in the hole. However, the Court feels that the plaintiffs have failed to prove that a milled blade which lacks the rough surface on the tool that results from welded blades, or the flatness of sides of the Parker blade as distinguished from the angular shaped external area formed when the base of the blades meet the tubular body of the Drilco tool, aid in solving the problem of balling up when combined with the other features of old tools. This is a necessity to the patent's validity, for without this new and different function, there is no invention, for there is no novelty, or synergistic result, and if there is no difference between the prior art and the claimed invention, what remains would be obvious to persons skilled in the art. In the Court's view, two plus two still equals four.

Finally, the Court notes that even if plaintiff had proved that his invention eliminates or greatly reduces the problem of balling up, such was not set forth as a claim in his patent application as required by 35 U.S.C. § 112.[3]

Section 112 provides in pertinent part:

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

---

3. 35 U.S.C. § 112 provides:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

The record reveals that plaintiff completely omitted the no-balling-up feature from the patent's specifications and at no time did he bring it to the attention of the Patent Office.

■ As stated by the Court in *Photo Electronics Corp. v. England*, 581 F.2d 772, 776 (9th Cir. 1978):

"The policy favoring liberal construction of patent claims, however, goes only so far. Patent validity may not be founded on functions or characteristics not mentioned in the patent claims. *Burgess*, 487 F.2d [321] at 324 [9th Cir. 1973]. A patentee cannot defend his patent's validity on the basis of functions or characteristics not apparent at the time the patent issued or discoveries that later altered his understanding of his invention's scope. *Standard Coil Products Co. v. General Electronic Co.*, 306 F.2d 319, 322–23 (2d Cir. 1962)."

If the prevention of balling up was in fact so vital an element in the functioning of plaintiff's tool, it is indeed strange that all mention of it was omitted. The idea that the tool prevents balling up appears to this Court to be the afterthought of an astute patentee or his attorney. *Graham v. John Deere Co.*, supra; *American Seating Co. v. National Seating Co.*, supra.

### Conclusion

The description in the Parker patent sets forth the following advantages due to the design of the invention being essentially triangular in cross-sectional configuration as distinguished from the generally square or round cross sections having four or more equally spaced ribs formed as an integral structure:

1. Greater wall contact with a fewer number of rib sections;

2. Substantially greater annular area for the flow of drilling fluids;

3. Prevention of sticking of the stabilizer in the hole;

4. Fast drilling operations.

■ The presumption of validity is weakened or completely destroyed because the prior art triangular stabilizer with three equally spaced ribs of Drilco was not cited and it possessed the most relevance in determination of patentability. Welded blades are equivalent to milled blades and since all of the Parker patent or equivalents were found in the prior art, the patent was anticipated and lacks novelty.

■ Further, this Court finds that all of the elements appeared in the prior art and the patent is invalid because it was obvious. (See Defendant Exhibit 19). This was practically conceded by plaintiffs when they claimed a synergistic effect or result.

■ Plaintiffs argue that a synergistic effect is provided by solving the problem of balling up. This function was completely omitted in the patent's specifications and was not raised before the Patent Office. Most important was the fact that aside from the testimony of the plaintiffs, no evidence was introduced that the Parker stabilizer solved the problem of balling up. The plaintiffs produced no technical experts or reports of objective evidence that the Parker stabilizer performed this function, although they had an expert present throughout the trial. It is indeed strange that with the vast number of tool-pushers, drillers and roughnecks that must have come in contact with plaintiffs' stabilizer, not one was produced at trial to provide lay testimony supporting the claim that no balling up occurs. Without such evidence this Court cannot conclude that the combination of the components of the patent produces a new or different function which is absent in the prior art.

---

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

686

While doubt on the question of patentability should normally be resolved in favor of the applicant, *Application of Pappas, et al*, 185 F.2d 695 (1950), the law requires that when a patent involves a combination of elements found in the prior art, the claims must be scrutinized *with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.* Secondary factors such as commercial success cannot save the patent from invalidity when there is such a plain lack of invention and obviousness is clear. Therefore the patent is invalid under 35 U.S.C. §§ 102 and 103 and because it failed to describe particularly that which was claimed to be invented under 35 U.S.C. § 112. See *American Seating Co. v. National Seating Co.*, supra. Because the patent is invalid, the issue of infringement need not be addressed.

On the claim for attorney fees by defendants, the Court feels that plaintiffs' case is not untenable—just unprovable. Balling up is a problem, notwithstanding the fact that defendants' expert, Garrett (inventor of the Garrett patent), testified that in all of his twenty-four years of employment in the oil and gas industry, he never heard mentioned any problem of balling up. He worked for Drilco for twenty-three and one-half (23½) years in Engineering Research and Development and was employed there when Drilco published its 1962–63 catalogue recommending its welded blade stabilizer as an effective tool when balling up may be a problem.

The Court does not find this to be an exceptional case justifying the award of attorney fees under 35 U.S.C. § 285.